UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Leslie E. Costa

     v.                             Civil No. 1:09-cv-441-JL
                                      Opinion No. 2010 DNH 190

Michael J. Astrue, Commissioner,
Social Security Administration

## O R D E R

This is an appeal from the denial of a claimant's
application for Social Security Disability Benefits.  See 42
U.S.C. § 405(g).  The claimant, Leslie E. Costa, contends that
the administrative law judge ("ALJ") incorrectly found that
although Costa had several severe impairments, see 20 C.F.R.
§§ 404.1520 (a),(c), she retained the residual functional
capacity ("RFC") to return to her past employment at a light
exertional level.  See 20 C.F.R. § 404.1520 (a)(4)(iv).  Costa
also contends that the ALJ made legal and factual errors in
analyzing the extent to which her complaints of physical pain
limit her capacity to work.  See generally 20 C.F.R.
§ 404.1529(c); SSR 96-7p, 1996 WL 374186 (July 2, 1996).  The
Commissioner asserts that the ALJ's findings are supported by
substantial evidence in the record, and moves for an order

affirming his decision.[1]  This court has jurisdiction under 42
U.S.C. § 405(g).  After a review of the administrative record and
a hearing on the parties' cross-motions, the court grants Costa's
motion, denies the Commissioner's motion, and remands the case.

## I.   APPLICABLE LEGAL STANDARD

The court's review under Section 405(g) is "limited to
determining whether the ALJ deployed the proper legal standards
and found facts upon the proper quantum of evidence."  Nguyen v.
Chater, 172 F.3d 31, 35 (1st Cir. 1999).  If the ALJ's factual
findings are supported by substantial evidence in the record,
they are conclusive, even if the Court does not agree with the
ALJ's decision and other evidence supports a contrary conclusion.
See Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 535
(1st Cir. 1988).  Substantial evidence is "such relevant evidence
as a reasonable mind might accept as adequate to support a
conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971)
(quotations omitted).  The ALJ is responsible for determining
issues of credibility, resolving conflicting evidence, and
drawing inferences from the evidence in the record.  See

---

[1]Costa's timely appeal to the Appeals Council, see 20 C.F.R.
§ 404.967, for review of the ALJ's decision was denied, rendering
the ALJ's decision the final decision of the Commissioner.  See
id. § 404.981.

<u>Rodriquez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981); <u>Pires v. Astrue</u>, 553 F. Supp. 2d 15, 21 (D. Mass. 2008) ("resolution of conflicts in the evidence or questions of credibility is outside the court's purview, and thus where the record supports more than one outcome, the ALJ's view prevails").  The ALJ's findings are not conclusive, however, if they were "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." <u>Nguyen</u>, 172 F.3d at 35. The ALJ's determination is reviewed based on the evidence of record at the time of his decision, so this court cannot consider additional evidence submitted only to the Appeals Council.[2] <u>Mills v. Apfel</u>, 244 F.3d 1, 5 (1st Cir. 2001).  If the ALJ made a legal or factual error, the decision may be reversed and remanded to consider new, material evidence, or to apply the correct legal standard.  <u>Manso-Pizarro v. Sec'y of Health & Human Servs.</u>, 76 F.3d 15, 16, 19 (1st Cir. 1996); <u>see</u> 42 U.S.C. § 405(g).

---

[2]As such, the court will not take into consideration records provided by Costa regarding the opinion of Lynn Chauvette, a registered occupational therapist and certified work capacity evaluator, dated March 12, 2008, and not presented to the ALJ. Admin. Rec. at 411-413; <u>see</u>  Cl.'s Brief at 4-5.

## II.  __BACKGROUND__[3]

## A. Procedural history

In June 2006, Costa, then 36 years old, applied for social security disability benefits claiming that she was disabled due to neck pain, shoulder pain, and swelling and pain in her hands and wrists.  Initially, she claimed she had been disabled beginning October 20, 2005, but later amended the onset date to December 6, 2005.  The Social Security Administration denied Costa's claim in December 2006, determining that although she had physical and mental impairments, Costa retained the functional capacity to return to her prior work.  Admin. R. 47-50.

Costa appealed that decision to the ALJ, who, after a hearing, affirmed the denial of her claim.  The ALJ concluded that although Costa has several severe impairments,[4] she retained the residual functional capacity to perform "almost a full range of light work that is only reduced by a need to avoid smoky

---

[3]The court summarizes the relevant facts as presented in the Joint Statement of Material Facts (Document No. 9).  __See__ LR 9.1(d).  The court will reference the administrative record ("Admin. R.") to the extent that it recites facts outside the parties' joint statement or directly quotes documents in the record.  __Cf.__  __Lalime v. Astrue__, No. 08-cv-196-PB, 2009 WL 995575, at *1 (D.N.H. Apr. 14, 2009).

[4]Specifically, fibromyalgia, chronic pain, carpal tunnel syndrome (left), spasmodic torticollis, and reactive airway disease in the presence of smoke and odors.

4

environments," Admin. R. 13, and "is capable of performing past relevant work as either a customer service clerk or stocking clerk." Id. at 14.  Costa's subsequent request to the Appeals Council for review of the ALJ's decision was subsequently denied, and this appeal followed.

**B. Medical and work history evidence before the ALJ**

Costa has a tenth grade education.  Prior to the onset of her alleged disability, her relevant work history included more than seven years, primarily as a "stocker" at Walmart and a customer service clerk/stocker at Toys 'R' Us, both large national retail stores.

Costa's medical history reveals long-term reports of muscle and joint pain, with varying opinions by medical providers on its origins, severity, and effect on her work capacity.  In November 2005, she visited the Coos County Family Health Services clinic, complaining of neck spasms and pain, fatigue, joint pain, and numbness in the fingers of her left hand.  She stated that unless she wore a wrist brace (or carpal tunnel protector) at night, her left hand would become "completely numb."  Admin r. 162.  She was examined by Dr. Magdalena Scherer, who noted tenderness and a limited range of neck motion and diagnosed Costa with carpal tunnel syndrome ("CTS") on her left side and spasmodic

torticollis.[5]  Imaging of her cervical spine was negative, but Costa continued to complain of limited motion and pain in her neck, headaches, and numbness in her left hand and sometimes her right.

In January 2006, Costa was examined by an orthopedic specialist, Dr. Harry Stearns, III, for continued neck pain and CTS on both her left and right side.  Dr. Stearns noted that although Costa's mood, gait, and station were normal, she exhibited pain and diminished neck motion.  The results of an x-ray and magnetic resonance imaging scan ("MRI") of her cervical spine were normal, except for "a very minimal disc bulge at C5-6," as were the results of a subsequent nerve conduction study requested by Dr. Stearns.  He concluded that Costa suffered from neck pain and bilateral CTS "with borderline to normal nerve conduction testing."

A March 2006 examination by Dr. Stearns showed continued pain and lack of mobility in rotation in her neck, and numbness in her left thumb.  He noted that her symptoms "may be slightly

---

[5]Carpal tunnel syndrome results from "compression of the median nerve in the carpal tunnel, with pain and burning or tingling paresthesias in the fingers and hand, sometimes extending to the elbow."  Dorland's Illustrated Medical Dictionary, 1850 (31st ed. 2007).  Spasmodic torticollis is an "abnormal contraction of the muscles of the neck . . . due to focal dystonia and spasms of the neck muscles.  The cause is unknown . . . ."  Id. at 1967.

better," Admin. R. 150, and that she had a normal range of motion, strength, and stability in her wrists.  At a follow-up appointment in April 2006, Dr. Stearns found that although Costa's neck rotation was limited and she had some neck tenderness, she had a full range of motion, normal strength, and stability in her shoulders, a full range of motion and normal strength in both hands, and no joint instability.[6]  Dr. Stearns categorized her condition as "neck pain and bilateral atypical hand numbness."  Admin. R. 148.  He recommended that Costa continue splinting her left hand at night and take Aleve twice per day.

Dr. Parker A. Towle, who had conducted a prior neurological exam of Costa's hands and finger pain yielding normal results, examined Costa again in June 2006.  He concluded that she did not show signs of systematic arthritis and that her symptoms did not appear to be primarily attributable to a carpal tunnel problem, although such a problem could develop in the future.  He opined

---

[6]A physical therapist who treated Costa reported that she exhibited virtually a full range of motion in her neck, but continued to have high levels of neck pain which limited her neck motion approximately four days per week.

that her symptoms might be related to Costa's hypothyroidism[7] and might improve with thyroid hormone replacement therapy.

At a physical exam by Costa's primary care provider, Nurse Practitioner Patricia Shute, in June 2006, Costa complained of vision problems, joint pain, muscle cramps, muscle weakness and stiffness, headaches, and depression.  Shute noted that Costa had normal alignment and mobility in her head and neck and a normal range of motion in her upper and lower extremities.  Shute stated that Costa's spasmodic torticollis was improved, but that her left-side CTS was unchanged.

When Costa returned to Dr. Stearns in September 2006, he noted that Costa:

> did have [a] work capacity evaluation done by Lynn Chauvette and I filled out an unemployment form for her echoing Lynn's findings.  Lynn feels she's at the sedentary work level.  Lifting and carrying, I think, are 13 pounds and she has marked limitation of all of her activities.

Admin. R. 228.

Later that month, Dr. Joseph Cataldo completed a residual functional capacity questionnaire based on certain medical

---

[7]Hypothyroidism is defined as a "deficiency of thyroid activity, characterized by decrease in the basil metabolic rate, fatigue, and lethargy."  Dorland's Illustrated Medical Dictionary, 920 (31st ed. 2007).

records provided to him.[8]  Dr. Cataldo opined that although Costa

had "a reduced functional capacity . . . the degree of

limitations expressed by [Costa] is not supported by the total

evidence in the file."  Admin. R. 199.  In his opinion, Costa was

capable of frequently lifting or carrying 25 pounds, occasionally

lifting or carrying 50 pounds; could sit, stand, or walk for

about six hours of an eight hour work day; and had no postural or

manipulative limitations.

A physical capacities questionnaire completed two months

later by Nurse Practitioner Shute, however, paints a very

different picture of Costa's physical limitations.  Shute opined

that Costa was unable to perform any work or work related

activities and was restricted from doing so for 12 months.  Shute

stated that Costa was unable to perform even light or sedentary

work for any hours in a work week and that during an eight hour

work day, Costa could do no sustained sitting, walking, or

standing.  Shute further opined that Costa could occasionally

lift and carry ten pounds, but no more.  Finally, Shute stated

---

[8]Both parties agree that it is unclear from the record which
records Dr. Cataldo reviewed before he submitted his RFC
assessment.  Dr. Cataldo did indicate, however, that the file he
reviewed did not contain any statements from Costa's treating
physicians regarding her physical capacities.  See Admin. R. 198.

that Costa could never use either her hands or feet for pushing

and pulling, fine manipulation, or simple grasping.

Costa's mental and emotional capacities were reviewed by an

examining physician, Dr. Martin Kaufman, and a reviewing

physician, Dr. Edward Martin, in November and December 2006.

Although Dr. Kaufman opined that Costa appeared "mildly depressed

[and] mildly anxious," neither physician found that Costa"s

functional capacity was significantly impaired by her psychiatric

issues.  Dr. Kaufman did note, however, that Costa's description

of pain and inability to work "appears to be genuine from a

diagnostic point of view."  Admin. R. 202.

In December 2006, Costa was examined by Dr. Lin Brown, who

found, <u>inter</u> <u>alia</u>, her spine to be "nontender," there was no pain

with the digital palpitation of her myofascial tender points, and

that she had decreased range of motion in her wrists.  Dr. Brown

noted that although Costa's history was consistent with

fibromyalgia,[9] "the absence of fibromyalgia tender points does

---

[9] "Fibromyalgia is described "a syndrome of chronic pain of
musculoskeletal origin but uncertain cause.  Further, the
musculoskeletal and neurological examinations are normal in
fibromyalgia patients, and there are no laboratory abnormalities.
The American College of Rheumatology nonetheless has established
diagnostic criteria that include pain on both sides of the body,
both above and below the waist and point tenderness in at least
11 of 18 specified sites."  <u>Johnson v. Astrue</u>, 597 F.3d 409, 410
(1st Cir. 2009) (quotations, brackets, and citations omitted).

suggest that we should look further before accepting this as the diagnostic label of choice."[10]  Admin. R. 409.  Later that month, however, after diagnostic testing ruled out rheumatoid arthritis, Dr. Brown opined that "the most likely cause of [Costa's] muscle and joint pain[11] is fibromyalgia." Admin. R. 221.

In November 2007, Nurse Practitioner Shute completed a fibromyalgia questionnaire.  Although she opined that the prognosis for Costa's left-side CTS, spasmodic torticollis, reactive airway disease, and plantar fasciitis/tendinitis was good, her pain was severe enough to render her incapable of tolerating even "low stress" work and that she was incapable of lifting 10 pounds and could rarely lift even a lesser weight. Shute opined that Costa could not stand, walk or sit for even

---

[10]An initial evaluation of Costa at the North Country Pain Clinic in October 2006 noted "[e]ven though she does not demonstrate the 'tender points' consistently, [Costa] has all other symptoms for fibromyalgia."  Admin. R. 258.  A fibromyalgia questionnaire completed by Nurse Practitioner Shute, see infra, indicated that Costa exhibited "multiple tender points."  Admin. R. 309.

[11]Between October 2006 and the ALJ's decision in February 2008, Costa went to the North Country Pain Clinic approximately once per month. The parties agree that, on average, Costa's pain during the week before each visit averaged a "four" on a ten point scale, with periods as high as "five" or "six."  On a few occasions, her average pain was reported at "six" or "seven," with one period reaching a level of "ten."  Notes from the pain clinic indicate that at the time Costa reported pain reaching a "ten," she was not observed to be "in any acute distress." Admin. R. 294.

relatively short periods of time and would need to shift between walking, sitting, and standing at will, and take unscheduled breaks at least hourly.  Shute further opined that as a result of her impairments, Costa is likely to be absent from work at least four times per month.[12]

## C. Costa's written statements and testimony

In her written submissions and oral testimony to the ALJ, Costa reported:  pain and limited movement in her neck; pain in her wrists; pain, numbness, and swelling in her hands; a burning sensation in her shoulder; back, elbow, knee, foot and toe pain; stiffness in her ankles; fatigue; and muscle weakness.  She also reported having headaches, dizziness and nausea multiple times a week, as well as symptoms of poor memory and concentration.  In addition, Costa is sensitive to smoke and strong odors, and tends to hyperventilate if exposed to these environmental triggers.

Costa does not work and lives with her mother and two school-aged children.  Costa consistently has stated that although she helps her mother with the household chores and

---

[12]A portion of a report from a an occupational therapist and certified work capacity evaluator who examined Costa in March 2008 indicates that the examiner believed Costa to be capable of at least sedentary work.  The court, however, can rely only on the records before the ALJ at the time of the February 2008 hearing.  Mills, 244 F.3d at 4-5.

caring for her children, participation in such daily activities for a period of time can inflame her symptoms and increase her pain.  For example, although Costa assists with the household chores, her hands hurt after a period of holding utensils or vacuuming.  After doing dishes or vacuuming she often must stop and rest.  She is often tired during the day and will nod off.[13]

Costa testified that she has trouble bending, walking and lifting.  She can stand only for ten minutes at a time before her back hurts, but sitting in one place also results in pain, so she must move around constantly.  She stated that if she uses her hands too much, they start to hurt and occasionally swell.  She testified that she did not think that she could return to her former job as a stocking clerk because it involves a lot of climbing, bending, and lifting.  In fact, she believes that she cannot do any type of work because of fatigue, pain, and swelling and stiffness in her fingers that make activities difficult to do on a sustained basis and create problems grasping.

---

[13]She also reported that playing computer games hurt her hands and shoulder.  Writing too long hurts her hands and makes her handwriting sloppy.  Holding the telephone for longer than ten minutes causes her hands to go numb.  Washing dishes for too long makes her back hurt so much that she needs to sit down.  She needs to rest the laundry basket on the stairs if carrying laundry upstairs.  In 2007, she stated that sometimes even lifting and carrying a folder of papers causes pain in her hands.

**D. The ALJ's decision**

The ALJ conducted a hearing in January 2008, at which only Costa testified.[14]  A month later, the ALJ issued an order denying Costa's request for benefits.  He found that Costa had "severe impairments," see 20 C.F.R. § 404.1520(c), resulting from fibromyalgia, chronic pain, carpal tunnel syndrome-left, spasmodic torticollis, and reactive airway disease.  The ALJ denied benefits, however, because he concluded that "[Costa] has the residual functional capacity to perform a range of light work except that she should not work in smoky environments."  Admin. R. 12.  The ALJ found that although "[Costa's] medically determinable impairments could reasonably be expected to produce the alleged symptoms, . . . [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  Id. at 13.  In his opinion, there was not sufficient "objective, independently verifiable evidence of the totally disabling nature of [Costa's] impairments."  Id.  The ALJ stated that although fibromyalgia had been diagnosed, one physician noted that there was an absence of consistent "tender points" that are often found in fibromyalgia patients.  Similarly, the ALJ found that the diagnosis of spasmodic

---

[14]Costa was examined primarily by her own representative, with very little questioning by the ALJ.  Admin. R. 30-31.

14

torticollis was made "without the benefit of unquestionable objective medical evidence," and that nerve conduction studies regarding her carpal tunnel syndrome were "normal" or only "slightly abnormal." Id.

The ALJ declined to give controlling weight to Nurse Practitioner Shute's opinion in both a physical capacities and fibromyalgia questionnaires that Costa was completely disabled. The ALJ summarily discounted Nurse Practitioner Shute's opinion, stating that: "I find that there is a lack of objective medical data to support the conclusions drawn by nurse practitioner Shute." Id.[15]

The ALJ also summarily addressed Costa's daily activities and pain management, concluding that she: "is able to live a fairly active life despite her impairments. . . . Although [Costa] does experience some intermittent pain and uses medication to reduce that pain, she does not live a life that demonstrates that she is incapable of any kind of work."[16] Id.

---

[15]As discussed infra, the ALJ did not address treating source Dr. Stearns' opinion that Costa had marked limitations in her functional capacities.

[16]The ALJ did not make mention of Costa's monthly visits to a pain clinic for trigger point injections beginning in October 2006 and lasting through the decision date.

The ALJ thus concluded, based on "the medical evidence and [Costa's] own description of her functional capacities," that she is capable of "almost a full range of light work that is only reduced by a need to avoid smoky environments due to her reactive airway disease."  Id.  He opined that she is capable of returning to her past work as a customer service or stocking clerk as it is "actually and generally performed."[17]  Id.

## III. **ANALYSIS**

A five-step process is used to evaluate an application for social security benefits.  20 C.F.R. § 404.1520(a)(4).  The applicant bears the burden through the first four steps to show that she is disabled.[18]  Freeman v. Barnhart, 274 F.3d 606, 608

---

[17]Although the ALJ specifically recognizes that Costa amended her alleged onset date from October 20, 2005 to December 6, 2005, see Admin. R. 9, he consistently bases his rulings on the October onset date, see Admin. R. 9, 11, 14.  Although not a critical error at this stage, the court notes this inconsistency should it become important on remand.

[18]Specifically, the claimant must show that:  (1) she is not engaged in substantial gainful activity; (2) she has a severe impairment; (3) the impairment meets or equals a specific impairment listed in the Social Security regulations; or (4) the impairment prevents or prevented her from performing past relevant work.  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

(1st Cir. 2001).  At the fifth step, the Commissioner bears the burden of showing that a claimant has the residual functional capacity to perform other work that may exist in the national economy.  Id.; see also 20 C.F.R. § 404.1520(a)(4)(v); Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991).  The ALJ's conclusions at steps four and five are informed by his assessment of a claimant's residual functional capacity ("RFC"), which is a description of the kind of work that the claimant is able to perform despite her impairments.  20 C.F.R. §§ 404.1520, 404.1545.

Here, the ALJ denied Costa's application because he concluded, at the fourth step of the evaluation, that although Costa was impaired, she possessed the RFC to perform her prior work as a customer service, or stocking clerk.  See id. § 404.1520(a)(4)(iv).  In general, at the fourth step of the process, the Commissioner considers whether, despite her impairments, the claimant is able to return to her past relevant work.  Id.  The claimant is required to "lay the foundation as to what activities her former work entailed [and to] . . . point out (unless obvious)--so as to put in issue--how her functional incapacity renders her unable to perform her former usual work."  Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 5 (1st

17

Cir. 1991); see generally Bowen v. Yuckert, 482 U.S. 137, 146 n.
5 (1987); Manso-Pizarro, 76 F.3d at 17.


## A. Residual functional capacity

Costa contends that the ALJ's conclusion that she has the
residual functional capacity to perform her past relevant work is
unsupported by the evidence.  She asserts that the ALJ, in
concluding that she was capable of performing light work, ignored
the opinions of both treating and non-treating physicians who had
concluded that she was capable of either medium work, or at most
sedentary work.[19]  She contends that the ALJ erred because he "is
not at liberty to ignore medial evidence, . . . [and improperly]
substituted his judgment for the medical opinions of all the
medical experts."  Cl. Brief at 5-6.  The court concludes that
the ALJ's residual functional capacity determination was flawed
and must be re-examined.

In a step four analysis, the ALJ, having already determined
that the claimant suffers a severe impairment, compares the
physical and mental demands of the claimant's past work with her

---

[19]The federal regulations classify the various levels of
exertion required for different types of work as:  sedentary,
light, medium, heavy, and very heavy.  20 C.F.R. § 404.1567.

current functional capacity or RFC.[20]  "[T]he ALJ is entitled to credit a claimant's own description of her former job duties and functional limitations, but has some burden independently to develop the record." Manso-Pizarro, 76 F.3d at 17  (citations omitted).  If the residual function capacity finding is supported by substantial evidence in the record, it is conclusive. Nguyen, 172 F.3d at 35.  Findings are not conclusive, however, "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Id.

When an individual is found to have an impairment, his or her ability to work is assessed in two ways:  the "medical source statement" and the RFC assessment.

> Even though the adjudicator's RFC assessment may adopt the opinions in a medical source statement, they are not the same thing:  A medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s).

---

[20]"Residual Functional Capacity" is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

SSR 96-5p, 1996 WL 374183, at *4 (July 2, 1996).  Although
determination of a claimant's residual functional capacity is an
administrative decision that is the responsibility of the
Commissioner, see 20 C.F.R. § 404.1527(e)(2), SSR 96-5p, 1996 WL
374183, at *2, an ALJ, as a lay person, cannot interpret a
claimant's medical records to determine her residual functional
capacity.  Manso-Pizarro, 76 F.3d at 17.  Instead, an ALJ must
rely on residual functional capacity evaluations from a physician
or another expert.  Id. at 17-18.  Put another way, although an
ALJ cannot ab initio interpret medical records to determine a
claimant's RFC, he can "render[] common-sense judgments about
functional capacity based on medical findings, as long as the
[ALJ] does not overstep the bounds of a lay person's competence
and render a medical judgment."  Gordils v. Sec'y of Health &
Human Servs., 921 F.2d 327, 329 (1st Cir. 1990); accord Nguyen,
172 F.3d at 35 (ALJ "simply not qualified to interpret raw
medical data in functional terms and no medical opinion supported
the determination").

     Furthermore, although the ALJ is the ultimate arbiter of a
claimant's RFC, he is prohibited from disregarding relevant
medical source opinions.[21]  See SSR 96-5p, 1996 WL 374183 at *5,

---

     [21]In evaluating the nature and severity of an impairment,
"[a] treating physician's opinion is generally afforded

Where an ALJ's RFC assessment is at odds with a medical source opinion, he must explain his reasons for disregarding that opinion.  See  20 C.F.R. § 404.1527(d)(2); SSR 96-8p, 1996 WL 374184, at *7; Marshall v. Astrue, No. 08-cv-147-JD, 2008 WL 5396295, at *4 (D.N.H. Dec. 22, 2008).

The court agrees with Costa that the ALJ erred because he improperly ignored a treating source's opinion in direct conflict with his final determination that Costa was capable of "almost a full range of light work that is only reduced by a need to avoid smoky environments."  In September 2006, Dr. Stearns'[22] indicated that he "echoed" an occupational therapist's conclusion that Costa was "at the sedentary work level."  Dr. Stearns concluded

---

controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record."  Lopes v. Barnhart, 372 F. Supp. 2d 185, 193-94 (D. Mass. 2005) (quotations and brackets omitted); see also SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996); 20 C.F.R. § 404.1527(d)(2).  Greater weight is given to a treating source "since these sources are likely to be the medical professionals most able to provide a proper picture of [the claimant's] medical impairment(s)."  20 C.F.R. § 404.1527(d)(2).  Further, the ALJ is required to "always give good reasons in the notice of determination or decision for the weight given to a treating source's medical opinion(s)."  SSR 96-2p, 1996 WL 374188, at *5, see generally 20 C.F.R. § 404.1527(d)(2).  The ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion."  SSR 96-2p, 1996 WL 374188, at *5.

[22]The ALJ specifically found that Dr. Stearns was a "treating physician."  Admin. R. 13.

21

that, "(l)ifting and carrying, I think, are 13 pounds and then she has marked limitation of all her activities."  Admin. R. 228.

The ALJ's order, however, does not even mention Dr. Stearns' opinion regarding Costa's work capabilities.[23]  "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, at *7.  While the ALJ's decision is in line with Dr. Stearns' weight limitations,[24] he completely ignored Dr. Stearns' observations about Costa's "marked" limitations.  This is error.  See Marshall, 2008 WL 5396295, at *4 (reversing ALJ decision because treating source opinion was "simply overlooked").  The ALJ's decision fails to "explain how

---

[23]The ALJ did mention that Dr. Stearns ordered a cervical MRI that was normal and that Dr. Stearns was unable to pinpoint the cause of her neck pain as evidence that Costa's impairments were not completely disabling.  The ALJ did not, however, analyze Dr. Stearns' notes regarding Costa's limitations.

[24]Dr. Stearns' notes do not exactly align with the regulatory definition of "sedentary work," namely, lifting weight no greater than 10 pounds, "occasionally lifting or carrying articles like docket files, ledgers, and small tools," and only occasional walking or standing.  20 C.F.R. § 404.1567(a).  Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds," a "good deal" of walking and standing, and "some pushing and pulling of arm or leg controls."  Id. § 404.1567(b).  As such, error is found in the decision's conflict with Dr. Stearns' opinion that Costa had "marked limitations."

any material inconsistences or ambiguities in the evidence in the case record were considered and resolved," SSR 96-8p, 1996 WL 374184, at *7;  see Torrey v. Barnhart, No. Civ. 03-293-M, 2004 WL 97648, at *5 (D.N.H. Jan. 21, 2004), and, so far as the record indicates, was "derived by ignoring evidence" on the record. Nguyen, 172 F.3d at 35.  The decision is reversed.

## B. Other issues on remand

The court vacates the ALJ's decision and remands the case for further review[25] because of the ALJ's failure to address Dr. Stearns' RFC assessment.  See supra Part III-A.  Costa raised a host of other issues that may arise again on remand, and as such, are worth noting.  See Forni v. Barnhart, No. 05-cv-406-PB, 2006 WL 2956293, at *8 (D.N.H. Oct. 17, 2006).

## 1. Credibility determination and the Avery factors

Costa contends that the ALJ's conclusions regarding the nature and extent of her pain were legally insufficient and unsupported by the evidence.  She argues that the ALJ failed to

---

[25]Costa asks the court to remand the case for a "step five" consideration of whether there is other work in the regional or national economy she can perform.  This would require the court to make its own "step four" determination, which it declines to do, instead reversing and remanding for further consideration by the ALJ consistent with this order.

properly apply the so-called "Avery factors" used to evaluate a claimant's subjective reports of pain.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29-30 (1st Cir. 1986).

Assessment of a claimant's credibility is the exclusive province of the ALJ, who observes the claimant, evaluates her demeanor, and considers how her testimony "fit[s] in with the rest of the evidence."  Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).  The ALJ's credibility determination is entitled to deference if it is supported by substantial evidence.  Id.

The ALJ must follow a two step process to evaluate a claimant's credibility.  See SSR 96-7p, 1996 WL 374186, at *2. The ALJ must first assess the claimant's complaints of pain by exploring whether her limitations are supported by "medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms."  Id. at *1; see also 20 C.F.R. § 404.1529(b).  Once the claimant demonstrates an underlying "medically determinable" reason for her pain,[26] the ALJ must "make a finding about the credibility of the individual's statements about the symptom(s) and its

_____

[26]Here, the ALJ determined that Costa had satisfied this step.  Admin. R. 13.

24

functional effects," by evaluating "the intensity, persistence, and functionally limiting effects of the symptoms . . . [and] the extent to which the symptoms affect the individual's ability to do basic work activities."  SSR 96-7p, 1996 WL 374186, at *1; <u>see also</u> 20 C.F.R. § 404.1529(c)(1).

In determining the credibility of a claimant's subjective testimony, the ALJ must consider the entire record, including objective medical evidence, the claimant's statements, information provided by physicians and other witnesses, and any other relevant evidence.  SSR No. 96-7p, 1996 WL 374186, at *2. When an ALJ has directly observed the claimant, he is "not free to accept or reject that individual's subjective complaints solely on the basis of such personal observations.  Rather, . . . the determination rationale is to contain a thorough discussion and analysis of the objective medical and nonmedical evidence, including the individual's subjective complaints and the adjudicator's personal observations."  <u>Avery</u>, 797 F.2d at 29. A claimant's subjective complaints of pain will be deemed credible only if they are consistent with objective medical evidence and other evidence in the record.  20 C.F.R. § 404.1529(a).  An ALJ cannot base credibility findings solely on the absence of objective medical evidence, rather, "the absence of objective medical evidence supporting an individual's

statements about the intensity and persistence of pain . . . is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence."  SSR No. 96-7p, 1996 WL 374186, at *6; see Pires, 553 F. Supp. 2d at 23 ("mandate to take evidence besides objective medical findings into account has been solidly established in the case law of this and other circuits"). Objective medical evidence does not have to corroborate precisely the claimant's reported pain; rather it only needs to be consistent with those complaints.  See Dupuis v. Sec'y Health & Human Servs., 869 F.2d 622, 623 (1st Cir. 1989).

In Avery, the court of appeals directed that when evaluating a claimant's subjective complaints of pain and other symptoms, the ALJ should consider a variety of factors including:  "1. [t]he nature, location, onset, duration, frequency, radiation, and intensity of any pain; 2. [p]recipitating and aggravating factors (e.g., movement, activity, environmental conditions); 3. [t]ype, dosage, effectiveness, and adverse side-effects of any pain medication; 4. [t]reatment, other than medication, for relief of pain; 5. [f]unctional restrictions; and 6. [t]he claimant's daily activities."  Avery, 797 F.2d at 28-29.

The ALJ's decision "must contain specific reasons for the finding on credibility, supported by evidence in the case record,

26

and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR No. 96-7p, 1996 WL 374186, at *4; see Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); Pires, 553 F. Supp. 2d at 22.  While detailed written discussion of the Avery factors is preferred, see Frustaglia, 829 F.2d at 195, an ALJ may comply with Avery if he explores the factors at the administrative hearing, see Forni, 2006 WL 2956293, at *10 (Avery analysis sufficient even though express analysis was cursory, where "searching review" of the record revealed that ALJ reviewed Avery factors at the hearing); Lopes, 372 F. Supp. 2d at 192, so long as there is substantial evidence in the record to support the ALJ's conclusions.  Pires, 553 F. Supp. 2d at 24; but see Torrey, 2004 WL 97648, at *5 (error for the ALJ to list factors and not "to discuss those factors or explain how they support his ultimate conclusion").

   The overall cursory nature of the ALJ's Avery analysis is troubling.  The ALJ's order lists the Avery factors, but only briefly and superficially discusses the objective medical and non-medical evidence.  Indeed, most of the analysis concerns a lack of objective medical evidence supporting Costa's pain, but it either completely ignores, or as discussed below,

27

insufficiently addresses key <u>Avery</u> factors.  Costa's history of seeking pain management treatment is not discussed in the ALJ's decision, <u>cf</u>. <u>Forni</u>, 2006 WL 2956293, at *10, nor were factors aggravating her joint pain and swelling.  While the ALJ's discussion of the objective medical evidence "poses the question of the credibility of [Costa's] subjective complaints, it does not answer it."  <u>Valiquette v. Astrue</u>, 498 F. Supp. 2d 424, 433 (D. Mass 2007); <u>see</u> <u>Pires</u>, 553 F. Supp. 2d at 24.

The court is also troubled by the ALJ's treatment of Costa's reported daily activities in evaluating her capacity to work. The ALJ noted that she helps care for her school aged children, does light housework, and sometimes shops for food.  Admin. R. 13.  The ALJ used this observation to conclude that "[a]lthough the claimant does experience some intermittent pain and uses medication to reduce that pain, *she does not live a life that demonstrates that she is incapable of any kind of work."*  Admin. R. 13 (emphasis added).  The court reminds the ALJ that "[t]o be found disabled, a claimant must show that [she] cannot perform 'substantial gainful activity,' not that [she] is totally incapacitated."  <u>Blake v. Apfel</u>, No. 99-126-B, 2000 WL 1466128, at *8 (D.N.H. Jan. 28, 2000) (quotations omitted).  "Substantial gainful activity" means an ability to "perform substantial services with reasonable regularity either in competitive or

self-employment." Id. (quotations omitted). "[A] claimant's ability to engage in limited daily activities, including light housework, is not necessarily inconsistent with the inability to perform substantial gainful activity." Id. (quotations omitted). The ALJ's cursory analysis of whether Costa's daily activities render her capable of substantial gainful activity is insufficient because it fails to demonstrate how her daily activities relate to actual functional requirements of the job market. See id. For example, the ALJ's simple listing of categories of activities appears to ignore the limited manner in which Costa performs these activities (for example, her reports of inflammation or needing to rest after household chores of a relatively short duration) and its implications for substantial gainful activity. See id. at *9. The court recognizes that it is the ALJ's province to make credibility determinations, and that "[n]o single [Avery] factor is dispositive," Forni, 2006 WL 2956293, at *11, "[t]o determine whether [the claimant's] daily activities evinced [her] ability to perform substantial gainful activity on a daily basis, the ALJ needed to examine more precisely the evidence of [the claimant's] routine and limitations." Blake, 2000 WL 1466128, at *8.

Similarly, although the ALJ summarily discounted Nurse Practitioner Shute's functional assessments, Admin. R. 13, the

29

court notes that Nurse Practitioner Shute opined that because of
Costa's impairments, she would be absent from work more than four
times per month.  Admin. R. 314.  Costa testified that prolonged
exertion inflames her symptoms to at least near incapacity, and
there are records from the North Country Pain Clinic documenting
visits approximately monthly for trigger point injections.  The
ALJ's order contains no analysis on the effect of absenteeism on
Costa's functional capacity.  See e.g. Rivard v. Barnhart, No.
CV-06-54-PB, 2006 WL 2956306, at *5-*6 (D.N.H. Oct. 17, 2006)
(error to ignore evidence of absenteeism); cf. Nguyen, 172 F.3d
at 35 (ALJ's findings not conclusive if derived by ignoring
evidence to the contrary).

It is true that an ALJ is not required to "slavishly" review
all of the Avery factors, particularly where the ALJ "thoroughly
questioned the claimant . . . in conformity with the guidelines
set out in Avery."  Frustaglia, 829 F.2d at 195 (citations
omitted).  Here, however, the ALJ's order and the hearing
transcript reveal little inquiry by the ALJ into matters beyond
the objective medical evidence.  This is not to say that had the
ALJ not improperly ignored Dr. Stearns' medical observations
about Costa's functional limitations the court would have
concluded that the ALJ's decision was unsupported by the
evidence.  Certainly, when questioned by her representative,

Costa discussed some <u>Avery</u> factors.  <u>Cf.</u> <u>Lopes</u>, 372 F. Supp. 2d
at 192.  The court merely notes that the order was, at most,
barely sufficient to support the ALJ's conclusion that Costa was
capable of light capacity work.  <u>Cf. id.</u>  On remand, a more
complete and comprehensive analysis of the <u>Avery</u> factors (in
addition to the medical evidence), insofar as they support or
refute Costa's subjective reports of pain, is warranted.  <u>See</u>
<u>Brown v. Apfel</u>, No. CIV.00-102-JD, 2000 WL 1875864, at *2 (D.N.H.
Dec. 22, 2000) ("As the court has repeatedly explained, a
recitation of the standard with little or no discussion of the
facts of the case, in the context of the pertinent factors, is
insufficient and is not acceptable."); <u>Adie v. Commissioner</u>, 941
F. Supp. 261, 270 (D.N.H. 1996).


**2. Fibromyalgia**

     Finally, the court's concern about the adequacy of the ALJ's
decision is heightened by recent circuit precedent involving
fibromyalgia.  The court of appeals recently stated that "once
the ALJ accepted the diagnosis of fibromyalgia, [he] also had no
choice but to conclude that the claimant suffered from the
symptoms usually associated with such condition, unless there was
substantial evidence in the record to support a finding that
claimant did not endure a particular symptom or symptoms."

Johnson, 597 F.3d at 414 (quotations, emphasis, and brackets omitted) (citing Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994)).  In Johnson, the court concluded that because "[t]he primary symptom of fibromyalgia, of course, is chronic widespread pain, and the Commissioner points to no instances in which any of claimant's physicians ever discredited [her] complaints of such pain," the ALJ's decision to discredit the claimant's reports of pain was unsupported by the evidence.  Id.

Here, the ALJ summarily dismissed Nurse Practitioner Shute's findings in her fibromyalgia questionnaire because "there is a lack of objective medical data to support [her] conclusions." Admin. R. 13.  Although the ALJ correctly noted evidence of the lack of consistent specific "trigger points" indicating fibromyalgia, see supra note 10, there were also instances where examining providers concluded that Costa's pain was real[27] and that she did exhibit tender points.  Id.  Given the guidance provided by the court of appeals in Johnson, it would be difficult to conclude on this record that the ALJ's decision discrediting Costa was supported by substantial evidence.

---

[27]Dr. Cataldo, a non-examining physician did opine that Costa's limitations were not supported by evidence in the file. But the court of appeals has questioned the weight that should be given to the opinions of non-examining physicians who do not cite fibromyalgia as a diagnosis or whose assessments were cursory. See Johnson, 597 F.3d at 412-13.

IV. **CONCLUSION**

Pursuant to sentence four of 42 U.S.C. § 405(g), Costa's motion to reverse and remand the Commissioner's decision (document no. 6) is granted.  The Commissioner's motion to affirm the decision (document no. 8) is denied.  The Clerk of Court is directed to enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  November 3, 2010

cc:  Ruth Dorothea Heintz, Esq.
     T. David Plourde, AUSA